UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
BROADCAST MUSIC, INC.,           |
                                 |
    Petitioner,              |     04 Civ. 9205 (LLS)
                                 |
       - against -         |     Related to 64 Civ. 3787 (LLS)
                                 |
WEIGEL BROADCASTING CO.,         |     **OPINION AND ORDER**
                                 |
    Respondent.              |
                                 |
------------------------------x


    Broadcast Music Inc.'s petition seeks an order exercising the Court's rate-setting authority under article XIV of the BMI Consent Decree,[1] setting reasonable music license terms and fees for Weigel Broadcasting Company's two local commercial television stations for the time period of April 1, 1999 to December 31, 2004 and, on an interim basis, from January 1, 2005 on.

    After a four day non-jury trial, the submission of post-trial briefs and subsequent letter briefs, the following constitutes the opinion and order of the court.

---

[1] United States v. Broadcast Music, Inc., 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), as amended by, 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. 1994).

The Parties

BMI is a non-profit music licensing organization that, on behalf of approximately 300,000 composers, songwriters and music publishers, licenses non-exclusive rights to publicly perform approximately 4.5 million musical works to a variety of music users, including local commercial television stations. BMI offers a blanket license and a per program license to local commercial television stations for monthly fees. Stations that choose the blanket license may, for a pre-determined flat fee, perform all of the music in BMI's repertoire as often as they like during the license period. Those that choose a per program license can also perform all of BMI's music as often as they like, but their fees are based on the percentage of their total revenues that derived from programs with performances of BMI music (other than music for which they held a license from another source, such as the composer).

Weigel is a television broadcasting company that operates two full-power television stations, WCIU-TV in Chicago, Illinois and WDJT-TV[2] in Milwaukee, Wisconsin. WCIU is not affiliated

---

[2] WDJT is a CBS network affiliate and airs both syndicated programming and programming supplied by CBS. Because Weigel concedes that WDJT is not different from other local commercial television stations for the purpose of determining a reasonable BMI license fee, (Agreed Facts ¶ 51), it plays no part in deciding this case.

with a television network, such as NBC, ABC or CBS. It airs primarily syndicated programming, which it obtains from television producers, studios or other third parties. That programming, like most commercial television programming, contains copyrighted music in BMI's repertoire, for which WCIU obtains a blanket license from BMI.

The BMI Consent Decree

BMI's ability to license the public performance rights in its music is governed by a consent decree that settled an antitrust suit brought by the United States ("BMI Consent Decree" or "Decree").[3] Under the Decree, BMI is required to make licenses available for public performances of its music and to provide applicants with proposed license fees upon request. BMI Consent Decree Arts. VIII(B), XIV(A). If BMI and an applicant cannot agree on a license fee, either party may apply to this court for the determination of reasonable or interim license terms and fees. Id. at Art. XIV(A).

---

[3] Supra, fn. 1.

The Television Music Licensing Committee

Because television programming often contains copyrighted music, the television industry formed a non-profit volunteer association to negotiate music license terms and fees with performing rights organizations such as BMI and its chief competitor, the American Society of Composers, Authors and Publishers ("ASCAP").  That association has existed in one form or another since before the BMI Consent Decree was entered, and is now known as the Television Music Licensing Committee ("TMLC").  The majority of the approximately 1,300 full-power local commercial television stations[4] in the United States now authorize the TMLC to negotiate on their behalf, and virtually all others agree to be bound by the outcome of the TMLC's negotiations with BMI or a rate-court proceeding between the TMLC and BMI.

Historically, local television stations represented by the TMLC or its predecessors paid music license fees to BMI and ASCAP equal to a percentage of each station's revenues.  In 1993, however, the ASCAP rate court rejected the percentage of revenue fee and set a flat license fee for the entire local commercial television industry.  <u>United States v. ASCAP</u>

---

[4] The ABC, NBC and CBS television networks have separate licenses to perform BMI music.

(Application of Buffalo Broadcasting Co., Inc.), Civ. No. 13-95 (WCC), 1993 U.S. Dist. LEXIS 2566, at *121-22, 290 (S.D.N.Y. Feb. 26, 1993). Following that decision, the TMLC told BMI that it would no longer negotiate music license fees on a percentage of revenue basis, and instead demanded a single, overall industry-wide fee, which the TMLC would then allocate among the individual stations.

In April 2002, BMI and the TMLC concluded three years of negotiations and reached an agreement for an annual industry-wide blanket-license fee of $85 million, which the industry would yield to BMI for its aggregate annual use of BMI-licensed music if all stations chose the blanket license. Under that agreement, in 2002 through 2004 a portion of that $85 million base fee would be allocated to every station in the industry.

The negotiation and agreement upon the industry-wide fee terminated BMI's contribution to the process: the allocation among the members of their respective contributions toward that amount was devised by, and carried out by, the Television Music License Committee.

The TMLC devised an allocation formula based primarily on television "ratings," which measure the size of a television audience. Taking ratings data compiled by Nielsen, each of the roughly 210 markets in the country as measured by Nielsen was placed in one of nine categories, each of which was arithmetically

weighted "to reflect, within a broad parameter, that a household in the 150th market does not represent the same value as a household in the New York market."   (Jt. Ex. 34, at WBC000024.) (The word "value," of course, refers to the desirability to advertisers, and the amount they will pay, for air time.)  Within each market a series of computations apportioned the total blanket license fee assigned to that market among the stations in it, according to each station's share of the viewing audience at different times during the average day.

Oversimplifying the process, it resulted in allocating each market's portion of the total $85 million among the stations in that market, according to the portion they enjoyed of that market's television audience.

## Negotiations Between BMI and Weigel

From 1995 to April 1, 1999, Weigel agreed to be bound by the outcome of the TMLC's negotiations with BMI, and executed a blanket BMI license agreement for WCIU.   The terms of the license and allocation formula for the 1995-1999 period were essentially the same as those for the 1999-2004 period, except for increases in BMI's industry-wide blanket base fee.

In May 1998, WCIU's monthly blanket fees under its 1995-1999 BMI license increased from $5,882 to $9,002.   Weigel

rejected the increase, writing to BMI that "the increases in the billing that you have sent us for May over these numbers are so substantial that we will await an explanation on how they were obtained." (Jt. Ex. 8.)   In February 1999, BMI's Senior Vice President of Licensing, Michael O'Neill, met with Weigel's Chairman, Howard Shapiro, in Chicago to discuss the increase in WCIU's fees.   With respect to the upcoming licensing period beginning April 1, 1999, O'Neill informed Shapiro that BMI was negotiating a license with the TMLC, which would take some time. O'Neill told Shapiro that BMI believed that WCIU was similarly situated to the stations represented by the TMLC, and that BMI was therefore obligated by its Decree to offer WCIU the same license as the TMLC. (O'Neill Tr. 87:24-88:6.)   He suggested three options to Weigel: join the TMLC and attempt to change the allocation formula, extend its present license and make payments under it on an interim basis during BMI's negotiations with the TMLC, or send BMI a letter requesting a negotiation which, under the BMI Consent Decree, would automatically entitle Weigel to perform BMI music. (Id. at 85:7-17.)   O'Neill testified that Shapiro agreed that the fees Weigel paid to BMI going forward would be interim fees, and that the parties would later negotiate final fees. (Id. at 86:20-23.)

I do not find that an agreement was made in that respect: it was more a consensual stand-off.   When Shapiro was asked at

trial whether he was satisfied with leaving it that way until the situation was resolved, he answered: "I was and I wasn't. It had some romance in that we weren't paying them but at the same time our instincts are to resolve it, which is why we kept trying to urge them to talk to us.  We would have been happy to do it at any time."  (Shapiro Tr. 748:6-25.)

On February 22, 1999, Shapiro wrote to BMI that Weigel did not want to be represented by the TMLC, and that it wanted "to negotiate a separate contract for ourselves and for our stations at the appropriate time."  (Jt. Ex. 13.)  Under the BMI Consent Decree, Weigel was thereupon considered an applicant for music license fees, entitled to petition the rate court for a reasonable fee, and to perform BMI music in the interim.  Weigel continued to pay BMI WCIU's 1997 monthly rate of $5,882, while BMI billed Weigel WCIU's 1998 monthly rate of $9,002 under its 1995-1999 license agreement.[5]

On May 24, 2002, BMI sent a letter to every station, including WCIU, informing them of the terms of the 1999-2004 BMI/TMLC license agreement, explaining how the TMLC allocation formula would apply to that station, and enclosing copies of blanket and per program licenses.  (Jt. Ex. 34.)  O'Neill testified that those letters were BMI's final "quote" and were

---

[5] The parties have since settled any amount Weigel owed BMI for the 1995-1999 license period.

agreed to by the industry. (O'Neill Tr. 93:19-23.) BMI thereafter billed Weigel monthly blanket fees for WCIU under the 1999-2004 BMI/TMLC license and TMLC allocation formula, which increased to $15,894 in 2002, $18,874 in 2003, and $22,017 in 2004. (Agreed Facts ¶ 35.) WCIU continued to pay BMI its 1997 rate of $5,882 per month.

On September 10, 2002, Mr. Shapiro wrote to BMI that "we are not part of the All Industry Music group and that we understand under the Court Order we are entitled to negotiate a separate contract with you" (Jt. Ex. 39), and concluded "We are prepared to do that at your convenience." (id.). Despite subsequent communications and meetings, the parties have been unable to agree on music license fees for the period of April 1, 1999 to the present.

On November 19, 2004, BMI filed its petition for an order setting reasonable license fees for Weigel's stations.


                        Setting a Reasonable Fee


The relationship between BMI and Weigel is governed by, and BMI has limited flexibility under, the Decree. The general method of setting a reasonable fee is well-recognized in case law. Essentially, it proceeds from prices paid in other transactions between willing sellers and buyers more or less similarly situated

to the particular case.  Those transactions (called "benchmarks")
are evaluated, their differences from the present case are
weighed, and a process of triangulation and adjustment develops
the proper figure for the case at hand.

As described in United States v. Broadcast Music, Inc. (Music
Choice), 316 F.3d 189, 194 (2d Cir. 2003):

> In making a determination of
> reasonableness (or of a reasonable fee), the
> court attempts to make a determination of the
> fair market value—"the price that a willing
> buyer and a willing seller would agree to in
> an arm's length transaction." [ASCAP v.
> Showtime/The Movie Channel, 912 F.2d 563,
> 569 (2d Cir. 1990)].  This determination is
> often facilitated by the use of a benchmark—
> that is, reasoning by analogy to an agreement
> reached after arms' length negotiation
> between similarly situated parties.  Indeed,
> the benchmark methodology is suggested by the
> BMI consent decree itself, of which article
> VIII(A) enjoins disparate treatment of
> similarly situated licensees.

That is the usual, and approved, method.  As the court
continued:

> While in some instances there may be reason
> to approximate fair market value on the basis
> of something other than the prices paid by
> consumers, in the absence of factors
> suggesting a different measure the price
> willing buyers and sellers agree upon in
> arm's-length transactions appears to be the
> best measure.

Music Choice, 316 F.3d at 195 (citing authority).

Since the most appropriate benchmarks may not exactly fit the
case at hand, they may need adjustment to produce a proper figure.

Examples of such adjustments are given in a later opinion of the
Court of Appeals in the same Music Choice case, 426 F.3d 91, 97
(2d Cir. 2005), elaborating on the rate court's duty:

> In choosing a benchmark and determining how
> it should be adjusted, a rate court must
> determine "the degree of comparability of the
> negotiating parties to the parties contending
> in the rate proceeding, the comparability of
> the rights in question, and the similarity of
> the economic circumstances affecting the
> earlier negotiators and the current
> litigants[.]"

Id. at 95, quoting Buffalo Broadcasting, 1993 U.S. Dist LEXIS
2566, at *61.

These principles are encapsulated in article VIII(A) of the
Decree, which forbids BMI from making or honoring any agreement
resulting in different fees between similar licensees. That is
not a matter of discretion or business preference, but a
prohibition BMI must follow, on pain of contempt:

> Defendant shall not enter into,
> recognize as valid or perform any performing
> rights license agreement which shall result
> in discriminating in rates or terms between
> licensees similarly situated . . .

BMI Consent Decree Art. VIII(A).

But the prohibition does not stop there. It recognizes that
within the same principle there is the corollary that different
fees must be allowed for licensees whose situations are different.
The proviso allows for adjustments based upon business factors
which justify them:

> . . . provided, however, that differentials
> based upon applicable business factors which
> justify different rates or terms shall not be
> considered discrimination within the meaning
> of this section[.]

Id.

Accordingly, BMI must give Weigel the same rate it gives all others who are similarly situated; but equally, its rate to Weigel must recognize any business factors affecting Weigel which justify treating Weigel differently.


Appropriate Benchmark


In this case there is only one available "benchmark."  It consists of the uniform process to which each of the 1,300 members of the industry have agreed, and which operates neutrally as to each of them.  The dollar figure to be paid by each station is calculated once for the following year and billed monthly.

Thus, the only "benchmark" in the industry lies in the acceptance by all its members (save Weigel) of their respective portions of the overall fee obligation.  Of course that does not mean that the process produced a reasonable rate with respect to Weigel.  If it did not, a reasonable rate must be set for Weigel, regardless whether that results in the other members of the industry bearing a greater or lesser proportion of the $85 million.

However, the virtual unanimity (even Weigel, up to a point) of the industry's acceptance of the negotiation-and-allocation method and its results, when each member had the ability to opt-out and make a rate court challenge as Weigel ultimately did, has two consequences.  It provides hundreds of "benchmark" transactions in support of that method, and it leaves an absence of competing benchmarks.[6]

Thus the question in this case is simple: whether, under article VIII(A) of the Decree there are "differentials based upon applicable business factors which justify different rates or terms" in Weigel's case.  If there are, Weigel should pay a different, reasonable rate.  If there are not, BMI is prohibited from offering different terms to Weigel.

Claims of Difference from Other Stations

The differences which Weigel perceives between its business and that of the other stations in the industry are not apparent when viewing the evidence as a whole.  Nor are they shown, even when aggregated, to present "differentials based upon applicable

---

[6] In 1993 station KXTX challenged the application to it of the analogous ASCAP/TMLC agreement and allocation formula, unsuccessfully.  United States v. ASCAP (Buffalo Broadcasting Co., Inc.), No. Civ. 13-95 (WCC), 1993 U.S. Dist LEXIS 15152 (S.D.N.Y. Oct. 28, 1993).

business factors which justify different rates or terms" in the words of article VIII(A) of the Decree.

Like many other stations, WCIU has no local news program, which requires a large initial and continuing investment. Similarly, its sports programming contracts are not unique, and they allow WCIU to avoid substantial costs while attracting a large audience. Some of its advertisers choose (or not) to advertise on those of WCIU's programs which primarily target African-Americans, as "other stations around the country do as well" (Geiger Tr. 513:24-514:1). Its programming "has been, and had been, shown on numerous other stations across the country" (O'Neill Tr. 105:23-106:8). Many other stations in the country are family-owned and privately held (id. at 105). Its programming generates less than average revenue at certain times of day, but is "exceptionally competitive" at others (Geiger Tr. 356-61).

Even though each factor Weigel mentions is unexceptional in the industry, their individual or cumulative effect upon Weigel might justify an adjustment to the benchmark for Weigel. Whether that is the case is best determined by comparing WCIU's license fees, as a percentage of its revenues, to the percentages of their revenues that are paid as fees by the other stations in the industry. All parties agree that the percentages-of-revenues comparisons are the most meaningful,

because the firms' revenues capture the net effect of all their business variations.

As a percentage of WCIU's revenues, its BMI license fees are equal to or less than the license fees paid by many other stations in the industry.  Of all blanket-license stations in the top 50 markets in the country, 104 paid a higher percentage of their program revenues in BMI fees in at least one year during the years 1999-2004 than the highest percentage of WCIU's revenues billed to it by BMI during any of those years.  (BMI Ex. 116.)

During 2003, WCIU's allocated fees, as a percentage of its program revenues, were similar to those of the Chicago stations affiliated with ABC, NBC and CBS.  The fees charges to WCIU were 0.61% of its revenues, while the network-affiliated stations WLS, WBBM, and WMAQ's respective portions of their revenues from non-network programming in BMI license fees are calculated at %0.67, 0.84, and 0.57%.  (BMI Ex. BMI-1, excluding revenues from network programming licensed and paid by the network, not the station.)  Thus, any business differences between WCIU and those stations that have network affiliations are not reflected in the proportion of its program revenues payable to BMI.  Weigel's business has been shown to present no factors which justify different rates or terms.  BMI Consent Decree Art. VIII(A).  The TMLC's Chairman, Charles Sennet, was asked "Do you have an

opinion about whether there are any business factors that are in any way different between WCIU and, let's say, any of your other stations, save the religious stations and the home shopping network?"  He answered "I think the answer is no."  (Tr. 450:2-16).

The Power Ratio

Weigel argues that the burden of paying the proposed fees would fall exceptionally heavily upon WCIU because of its low "power ratio."  The power ratio allows comparison of a station's efficiency in converting its audience into advertising income with the other stations in the same market, by dividing the station's share of the total program revenues in the market by its share of the total viewers in the market.  A ratio above 1 reflects a dollar yield from the audience above the average, and a ratio below 1 shows the station is obtaining fewer dollars than that market's average from its audience.  (Because the shares are percentages, and the ratio is composed of percentages, and 30% (of the dollars) divided by 30% (of the viewers) equals one.)  The power ratio tells nothing about the dollar amount of program revenues generated, and does not allow revenues comparisons with stations in other markets.  It tells

you nothing about the dollar revenues in either the specific market or industry.

In fact, WCIU's power ratio is not dissimilar to those of other stations in the industry.  Among only those stations in the country with annual revenues over $30 million, <u>i.e.</u>, about 15% of the industry, approximately 170 had power ratios greater than WCIU's, and 15 of them (which is 8%) had lower power ratios than WCIU's.  (Weigel Ex. JS-5, Table 2.)

Use of Overall Percentage

Weigel asks the court to set a rate for WCIU based on the total BMI fees paid by the entire local television industry over the 1999-2004 time period as a percentage (approximately 0.33% to 0.41% by different calculations) of the industry's estimated program revenues during that period, instead of what WCIU was billed: 0.59% of its revenues in 1999, 0.54% in 2000, 0.49% in 2001, 0.69% in 2002, 0.63% in 2003, and 0.68% in 2004. (Weigel's Proposed Findings of Fact ¶ 22.)

The concept is unrealistic.  That percentage represents an amalgam of those stations who paid more and those who paid less than the average, and there is no support for the assumption that a reasonable fee for Weigel would fall at the middle.  The more refined and ramified process employed by the TMLC in

allocating the portions of the overall fee treated Weigel more rationally than merely arbitrarily selecting an average.


Other Arguments


Weigel raises arguments in the nature of waiver, estoppel or laches based on claims of BMI's failure to give Weigel timely notice in writing of "the fee which it deems reasonable for the license requested" under Decree article XIV(A), and seeks as remedies for this alleged violation, and for BMI's claimed ensuing failure to negotiate, that BMI be barred from the relief it seeks in this proceeding, and Weigel be awarded its attorneys' fees. The arguments fail, for a variety of reasons.  BMI cannot be faulted for refusing to deviate from the figure applicable to the rest of the industry, lest it contravene the Decree's non-discrimination provision.  Weigel suffered no injury during the delay, for it was paying less than its license specified.  It was well aware of the fee that BMI deemed reasonable, for that figure appeared each month on the bills BMI sent to Weigel.  If Weigel was dissatisfied with the continuation of that situation, it could have applied at any time to this court for the determination of a reasonable fee.  Decree Art. XIV(A).

Weigel claims that BMI violated article VIII(B) of the Decree by not offering a reasonable per program license.   That is

immaterial, for Weigel never applied for such a license.  Further,
an offer to Weigel of a per program license upon terms different
from those upon which it was offered to the rest of the industry
would, under Decree article VIII(A), require business factors
justifying the difference, which do not appear in this case.

Conclusion

For the foregoing reasons, the petition is granted and
Weigel is directed to pay BMI at the rates established by the
BMI/TMLC license agreement and allocation from April 1, 1999 to
date, with interest at the legal rate, but with credit for the
payments already made.

So ordered.

Dated: New York, NY
       May 30, 2007

Louis L. Stanton
Louis L. Stanton
U.S.D.J.